## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| FMC CORPORATION, MARK A. DOUGLAS, and ANDREW D. SANDIFER | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff"), by and through its undersigned counsel, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on, among other things, the independent investigation of counsel. This investigation includes, but is not limited to, a review and analysis of: (i) public filings by FMC Corporation ("FMC" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) transcripts of FMC conferences with investors and analysts; (iii) press releases issued by the Company; (iv) media reports concerning FMC; (v) analyst reports concerning the Company; and (vi) other public information regarding FMC.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a securities class action on behalf of all persons and entities that purchased or acquired FMC common stock between February 9, 2022 and October 30, 2023, inclusive (the "Class Period"). Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against: (i) FMC; (ii)

3974903.3

the Company's President and Chief Executive Officer ("CEO") Mark A. Douglas ("Douglas"); and (iii) FMC's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer Andrew D. Sandifer ("Sandifer").

2.    FMC is an agricultural sciences company based in Philadelphia, Pennsylvania. Two of its key products are purportedly patented molecules used in insecticides named Rynaxypyr and Cyazypyr.  FMC sells its insecticides (and the remainder of its products) directly through its own sales organization as well as through independent distributors and other partners.

3.    Throughout the Class Period, the Company stated that it achieved "record results" driven by sustainable, recurring factors such as the introduction of "new products and continued market expansion of Rynaxypyr® and Cyazypyr®."  FMC also assured investors that demand for its products was "very, very strong. . . it's very strong all over the world."  When asked regarding the Company's "channel inventories" (*i.e.*, the amount of product sitting with distributors that had not yet been sold) and whether FMC's demand was driven by transitory factors like customer "prebuying," CEO Douglas dismissed the concerns, stating that "we are not concerned about channel inventories . . . we're not seeing anything that we would say is concerning at all."  And once FMC began to acknowledge a buildup of inventory, Douglas said the buildup was limited to "pockets" in certain regions and attributed the buildup to routine business events such as being "in the planting season" or "a drought."

4.    FMC also consistently represented that its business was insulated from competition given a suite of "process patents" that covered Rynaxypyr and Cyazypyr, providing further assurance to investors regarding the strength and sustainability of demand for the Company's products.  CFO Sandifer stated that "there's not a single legal competitor in Rynaxypyr in the

world today" and FMC repeatedly referenced significant legal victories with respect to its patent portfolio that it achieved in crucial markets like India and China.

5.     In truth, however, and unbeknownst to investors, demand for FMC's products was artificially boosted by customer double-ordering after the dissipation of pandemic disruptions, a transitory occurrence that was unlikely to recur.  FMC's channel inventory was full of product due to this pull-forward of orders rather than channel inventory being, as Douglas described it, at "normal" levels or due to cyclical business factors such as seasonality.  What's more, starting in or around September 2022, FMC had lost critical patent litigation in India and China which led to increased competition from generic producers, further exacerbating the company's inventory buildup.  FMC knew or recklessly disregarded these facts at the time given the Company's claimed oversight of its patent portfolio and in-depth supervision of its supply chain, where it supposedly had keen visibility into demand, inventory levels, and how customers used the products.

6.     On July 10, 2023, FMC announced that it had experienced "[a]brupt and unprecedented reductions in channel inventory by customers in North America, Latin America and EMEA" leading to "unprecedented volume declines" across nearly all its business.  As a result, FMC slashed its 2Q 23 Adjusted EBITDA forecast by about 50% to a range of $185-$190 million (after raising full year EBITDA outlook just two months earlier).  In addition, FMC announced that it imposed "[s]ignificant cost mitigation actions," cutting operating expenses in the second half of the year by $60-$70 million to conserve costs.

7.     Wall Street analysts questioned whether FMC overstated demand in prior years as well as the Company's justification for the destocking.  Morgan Stanley analyst Vincent Andrews wrote on July 10, 2023, that "[k]ey investor questions are likely to include . . . [w]hy is the destocking taking place given the company is calling out flat underlying grower consumption of

FMC's products?  [] does this mean that volume sales in prior years[] overstated underlying demand and therefore this is actually an earnings reset."  Echoing Morgan Stanley's concerns, Bank of America Global Research analyst Stephen V. Byrne also questioned the claimed strength and nature of FMC's demand, writing in a July 11, 2023 report that the "[m]ost concerning point, in our view, is volumes last year [] were largely buoyed by customer double-ordering due to the supply chain constraints.  This means 'normalized' CPC volumes could be well-below last year's level."

8.      The news of the abrupt and unprecedented reductions in inventory caused the price of FMC common stock to decline $11.62 per share, or over 11%, from $104.25 per share on July 7, 2023 to $92.63 per share on July 10, 2023.

9.      Roughly two months later, on September 7, 2023, an activist investment firm named Blue Orca Capital issued a report claiming that FMC "concealed from investors the deterioration of [its] core business[,] resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits."  To support its claims, Blue Orca "spoke to a number of experts, including former employees of FMC and its distribution partner [named UPL Ltd. ("UPL")] who said that a reversal of the factors which temporarily boosted the Brazilian crop protection market during the Covid induced supply chain disruption is likely to drop the crop protection industry back to 2021 levels, erasing the gains of the last 2-3 years."

10.     More specifically, one of the executives to whom Blue Orca spoke is a current senior finance executive at UPL in Brazil.  The UPL executive explained to Blue Orca how the crop protection market in Brazil grew from $12 billion to $21 billion in the last three years. According to the executive and as recounted by Blue Orca, "this growth was 'very unusual' and resulted because of shortages caused by a perfect storm of COVID, China supply chain disruptions,

labor shortages, the Russia/Ukraine war, and supply chains permanently migrating away from China.  He explained that these events caused crop protection product shortages that caused prices to skyrocket and, at the same time, distributors and cooperatives scrambled to over-purchase whatever they could because of fear of prolonged supply shortages."

11.     Blue Orca further described how "FMC has concealed from investors that it has suffered a recent string of stunning legal defeats around the globe that have enabled competitors to now launch competing generics at prices up to 80% below the price of FMC's flagship insecticide product."  Indeed, according to Blue Orca, "[d]espite the expiration of the composition patents on FMC's diamides [insecticides], FMC tells investors it will not face generic competition on its flagship products until 2026 at the earliest because FMC still holds a suite of 'process' patents, which FMC claims will bar generic entrants for the next several years.  Absurdly, FMC even tells investors that 'there is not a single legal competitor … in the world today.'  This is simply not true." (emphasis removed).  The additional generic competition further dented demand for the Company's products and exacerbated the inventory surplus caused by customers' double-buying behavior.

12.     In response to this news, the price of FMC common stock declined $6.09 per share, or about 7%, from $82.19 per share on September 6, 2023 to $76.10 per share on September 7, 2023.

13.     Then, on October 23, 2023, FMC cut its revenue and earnings outlook for 3Q and FY 2023 due to continued destocking throughout its entire business, with the reductions being particularly severe in Latin America.  FMC also acknowledged that the "significant global destocking impacts are expected to persist into next year" and are "not expected to improve in the near-term."  As a result, FMC "initiated an immediate restructuring process for our operations in

Brazil" and "launched a broader, more comprehensive process to review and adjust our total Company cost structure."

14.     The news disclosed on October 23, 2023 caused the price of FMC common stock to decline $8.83 per share, roughly 13%, from $66.95 per share on October 20, 2023, to $58.12 per share on October 23, 2023.

15.     Finally, on October 30, 2023, the Company reported earnings for 3Q 23 and revealed that revenue for the quarter declined 29% as compared to the prior year, driven primarily by lower volumes from channel destocking, with the destocking being particularly pronounced in Brazil.  As a result, the company recorded a loss of three cents per share in 3Q 23 as compared to a profit of 95 cents in 3Q 22.  The next day, on October 31, 2023, Sandifer discussed how the "sudden deceleration" in FMC's earnings required the Company to negotiate temporary debt covenant relief.

16.     The news revealed on October 30 and 31, 2023 caused the price of the Company's common stock to decline $4.76 per share, or over 8%, from $57.96 per share on October 30, 2023 to $53.20 per share on October 31, 2023.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of FMC stock, Plaintiff and other putative Class members have suffered significant losses and damages.

### JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because FMC's corporate headquarters is located in this District at 2929 Walnut Street, Philadelphia, Pennsylvania 19104, and Defendants conducted substantial economic activity in this District.   As such, substantial acts in furtherance of the alleged fraud occurred in this District, including the dissemination of materially false and/or misleading information.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

22.     Plaintiff Oklahoma Firefighters Pension and Retirement System is a public pension fund established in 1980 to administer pension benefits for Oklahoma firefighters.   As of June 30, 2023, Plaintiff managed approximately $3.4 billion in total assets on behalf of nearly 27,000 members.   Plaintiff purchased FMC stock during the Class Period and, as detailed in the Certification attached hereto and incorporated herein, has been damaged thereby.

23.     Defendant FMC is an agricultural sciences company with its corporate headquarters and principal place of business in Philadelphia, Pennsylvania.   FMC's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FMC."

24.     Defendant Mark A. Douglas is, and was at all relevant times, FMC's President, CEO, and a member of the Company's Board of Directors.

25.     Defendant Andrew D. Sandifer is, and was at all relevant times, FMC's Executive Vice President, CFO, and Treasurer.

26.     Defendants Douglas and Sandifer (collectively the "Individual Defendants"), because of their positions with FMC, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

27.     The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

28.     Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

29.     FMC is one of the world's largest providers of agricultural chemicals in terms of sales.  The company develops, markets and sells three classes of crop protection chemicals (insecticides, herbicides and fungicides) as well as biologicals, crop nutrition, and seed treatment products.  In 2022, FMC generated $5.8 billion in revenue, most of which (58%) stemmed from the sale of insecticides.  The Company's flagship insecticides are based on two purportedly patented, diamide-class molecules named Rynaxypyr® (chlorantraniliprole) and Cyazypyr® (cyantraniliprole).  In 2022, Rynaxypyr and Cyazypyr represented approximately $2.1 billion in

combined sales for FMC, or roughly 36% of the Company's total revenue in 2022. They are among the best-selling insecticides in the world.

30.    FMC markets its products through its own sales organization and through alliance partners, independent distributors, and sales representatives. It operates in North America, Latin America, Europe, the Middle East and Africa ("EMEA"), and Asia. With respect to each region, Latin America generated the largest portion of FMC's revenue in 2022 (36%), followed by North America (25%), Asia (21%), and EMEA (18%).

31.    Two of the factors most critical to FMC's success are its ability to gauge demand and manage its "channel inventory" of products. Channel inventory refers to the amount of product that is out in the supply chain but not yet sold, typically between a manufacturer (like FMC) and its partners (like distributors or wholesalers). Excess channel inventory results in a surplus of goods throughout the distribution chain, causing the manufacturer's partners to significantly reduce purchasing products and/or sell the products they have at reduced prices.

32.    Also important to FMC's success is its ability to enforce its patent rights and protect its key products (like Rynaxypyr and Cyazypyr) from competition, and particularly generic competitors who frequently sell non-branded equivalents at lower prices. The Company frequently discussed the importance of defending its patent rights when challenged and how "our patent and trademark estate related to our diamide insect control products based on Rynaxypyr® and Cyazypyr® active ingredients in the aggregate are of material importance to our operations." If FMC's patents were invalidated and new, generic competitors entered the market, demand and/or pricing for the Company's products would decline, all else being equal. The impact on demand would be particularly pronounced when coupled with the presence of excess channel inventory.

**Materially False and Misleading Statements Issued During the Class Period**

33.    The Class Period begins on February 9, 2022.  After the market closed on the prior day, February 8, 2022, FMC issued a press release announcing that it achieved "record fourth quarter results" for 2021.  The press release explained how the Company's record results were "driven by strong demand and pricing actions" as well as by "new products and continued market expansion of Rynaxypyr® and Cyazypyr®."  Douglas explained in the press release how the Company was experiencing "a healthy demand environment" and that FMC's revenue growth was "particularly robust in North America and Latin America."

34.    The next day, on February 9, 2022, FMC held its earnings call for 4Q 21.  On that call, Goldman Sachs analyst Adam Samuelson asked Douglas about the sustainability of the Company's earnings and the amount of product sitting in FMC's inventory channels.  According to Samuelson, "where [do] you think channel inventories kind of ended the year and the headwind tailwind that [] might present to the volume opportunity. . . Certainly seems like a pretty constructive crop price and farm income environment.  Certainly good momentum on the new product side that seems to be accelerating.  And so I guess I'm just trying to calibrate if we should– the scope for volume upside over the course of the year?"

35.    In response, Douglas was unwavering with respect to the strength of FMC's demand and health of channel inventories.  According to Douglas:

> from a volume perspective . . . there's obviously—there's very, very strong demand out there. . . . I think from a market demand perspective, it's very strong all over the world.  I mean when I think about channel inventories today, frankly, I have very, very few concerns from where I sit at FMC.  There are pockets in India following the spotty monsoon that we had last year, but they're not significant. Brazil, we have—from FMC's perspective, we got absolutely 0 concern.  From North America and probably the other way around when it comes to channel inventories, I'm more concerned that there is not enough material there.  Europe, not really a problem at all.  So channel inventories, frankly, in our own internal

conversations has not really come up much in the last quarter.  Demand has come up.  Demand is very, very strong…

36.    The next month, on March 8, 2022, FMC presented at the RBC Capital Markets Chemicals and Packaging Conference.  During the conference, RBC analyst Arun Shankar Viswanathan asked Douglas to go through a "regional roundup" of FMC's business starting with Latin America.

37.    Douglas responded by stating that "Latin America has been a very good year for us . . . Brazil was very strong . . . Argentina similar . . . Mexico was very good . . . overall, demand was very strong.  We introduced a number of new products. . . . Channel inventories for us are normal, if not low in some parts of Latin America…"

38.    On May 3, 2022, FMC held its earnings call for 1Q 22.  On that call, Goldman Sachs analyst Adam Samuelson asked again about "channel inventories" and voiced concern about "a good amount of prebuying in a lot of different regions ahead of maybe an expectation of additional price increases, concerns around supply chain."

39.    In response, Douglas dismissed the concerns, stating that "we are not concerned about channel inventories . . . we're not seeing anything that we would say is concerning at all. They seem pretty normal to us."  As to FMC's specific regions, Douglas stated that "[w]e're not worried about where our inventory levels are at all in Brazil or Argentina," and regarding North America "I don't think we'll carry in excess inventories as we are going into the channel into the seasons."

40.    Approximately two weeks later, on May 18, 2022, FMC presented at the BMO Capital Markets Farm to Market Conference.  During the conference, BMO analyst Joel Jackson likewise asked about the amount of inventory in FMC's inventory channels, questioning "what are

crop protection inventories like in the channel, in different markets—market dynamics in different markets?"

41.     Douglas reiterated his earlier refrains that "inventories are where they should be right now. . . I think inventories are in good shape" and that the only reason for an inventory buildup was a "monsoon" that impacted "parts of India."

42.     Later during the conference, BMO analyst Joel Jackson asked a question from an audience member about the level of visibility FMC had into its inventory.  As asked by Jackson, "how can [FMC] manage inventories versus the past?  In the past, maybe you didn't have as much visibility. . . into your inventory in Brazil. . . . where are you different now?"

43.     Douglas assured investors that FMC had deep insight into the Company's inventory, down to the "grower level" and "how much is getting used on the ground," and that FMC was not experiencing any inventory issues in Brazil:

> Today, we have a system that is very different.  We manage inventory not only in our own facilities, not only in third-party warehouses but also at the grower level. So our sales force and our financial groups are actually lockstep in terms of how much product are we selling into the market?  How much is actually getting through to the grower?  And then importantly, how much is getting used on the ground?  So the system is completely different to what it was 7, 8, 9 years ago in terms of how we manage inventory in Brazil.  And right now, as I said earlier, there are no issues with inventory in Brazil for us.

44.     On August 3, 2022, FMC held its earnings call for 2Q 22.  During that call, Jefferies analyst Laurence Alexander asked for "a bit more detail on inventory levels regionally that you're seeing heading into the back half of the year?"

45.     In response, Douglas stated that the Company's inventory position was sound and that the growth it was experiencing was due to "building out our market share in pretty much every country" in Latin America and "expanding [] market access."  Specifically, Douglas told investors:

We're very okay with inventory levels pretty much everywhere in the world right now.  I would say the only spot and I've commented on this at the last earnings call is there has been a significant reduction in rice acres in India.  And we're working through inventory in India.  That will be done as we go through the second half of the year.

Everywhere else, frankly speaking, is very good from our perspective on inventory.  So we're not worried about that going into the end of the year.  With regards to Latin America growth, we are on a growth trajectory because we're building out our market share in pretty much every country from Mexico, Argentina and Brazil.  What's little known.  We talked about it a little bit in Brazil is our market access.  We're investing in more sales resources to reach further into distribution and retail and especially with the major co-ops in the South.

So the growth we're seeing is actually market share growth, especially in corn and soy with insecticides and herbicides.  So I know the numbers look big in Latin America, but we really are growing very quickly, and it's new growth for us.  It's not necessarily repeat growth in the sense of selling to the same people, which we obviously do.  We're expanding that market access.

46.     As inventory levels increased, the Company provided false excuses for the buildup, while continuing to claim that the Company had keen insight into demand and had significant orders to fill.  What's more, FMC misrepresented and concealed that it had lost significant patent litigation in India and China, which further scraped demand as generic competitors had entered the market.

47.     More specifically, on November 1, 2022, FMC issued a press release announcing earnings for 3Q 22.  The press release stated that the Company's quarterly results were "driven by robust start to the Latin American season and strong pricing actions across all regions."  With respect to Latin America, FMC stated that sales in the region "grew 35 percent year-over-year driven by strong herbicide and insecticide demand" and stated with respect to Brazil, that "FMC is reaping the benefits of investing in expanding market access for its products. . . ."

48.     The next day, on November 2, 2022, FMC held its earnings call for 3Q 22.  During that call, Vertical Research Partners Kevin William McCarthy asked "are you seeing inventory

levels that you would describe as outlying either in terms of being too high or too low in any of your major markets nowadays?"

49.    Douglas told investors that "we're happy where inventory levels are in the marketplace. . . the U.S., things are fine.  Europe is pretty okay for us."  According to Douglas, there were simply "pockets of higher inventories" in India because of "weather monsoons" and in Brazil because "we're in the planting season" and "a drought last year."  Still, Douglas rounded-out his response by reiterating that "we're happy with where our inventories are right now."

50.    Also on November 2, 2022, the Company filed its quarterly report for 3Q 22 on Form 10-Q with the SEC, which was signed by Sandifer.  The 3Q 22 Form 10-Q stated that while "[t]he composition of matter patents on our Rynaxypyr® active ingredient are nearing their expiration in several key countries[,] [w]e have a broad estate of additional patents regarding the production of Rynaxypyr® active ingredient, as well as trademark and data exclusivity protection in certain countries that extend well beyond the active ingredient composition of matter patents."  What's more, the 3Q 22 Form 10-Q stated that the Company "intend[s] to strategically and vigorously enforce our patents and other forms of intellectual property and have done so already against several third parties."

51.    The 3Q 22 Form 10-Q omitted any discussion of FMC's significant patent litigation losses in India, which had already occurred, and downplayed the impact of its losses in China:

> As noted in our 2021 Form 10-K, in early 2022, we received notice that certain third parties were seeking to invalidate our Chinese patents on a certain intermediate involved in producing chlorantraniliprole and a process to produce chlorantraniliprole; we intend to defend vigorously the validity of both patents. During the third quarter of 2022, the China Patent Review Board issued rulings which held that the two challenged patents were not valid in China.  We believe the Review Board's decisions are seriously flawed both on procedural and substantive ground and we have filed appeals.  Under Chinese law, the patents remain valid but are not enforceable pending appeal.  Given the unique and specific Chinese patent law issues at issue in that situation, we do not believe that the China Patent Review

Board's decisions would materially adversely impact our enforcement of similar patents in other countries. . . .

The composition of matter patent that covers chlorantraniliprole (also known as Rynaxypyr® active) expired in a number of countries in August 2022; this patent will continue to remain in force in other countries throughout the world, expiring on a country-by-country basis at various dates through 2027.  As described in our 2021 Form 10-K, we are deploying a multi-pronged strategy to defend that business after active ingredient patent expiration, including enforcement of our patents in many countries which continue to cover chemical intermediates and manufacturing processes that are essential in the production of chlorantraniliprole.

52.     The next week, on November 8, 2022, FMC presented at the Morgan Stanley Global Chemicals, Agriculture and Packing Conference.  At that conference, Sandifer told investors that FMC was "expecting a pretty robust demand environment going into next year.  So we're actually building inventory slightly in addition to dealing with just the inflationary impact on inventory values.  But we're actually building and maintaining inventory despite the higher sales so that we're well prepared to go into Q1 and early Q2 with material."

53.     On February 7, 2023, FMC published a press release announcing "record" earnings for 4Q and FY 22.  The press release stated that the Company's 4Q 22 performance was "driven by volume and pricing gains; 2023 outlook reflects pricing momentum and robust demand." Elaborating on the Company's performance, the press release quoted Douglas as stating that FMC's "record performance in the fourth quarter" was "driven by robust volume growth, continued strong pricing actions as well as growth of new products . . . North America delivered exceptional revenue growth, with Latin America and Europe, Middle East and Africa (EMEA) posting strong gains."  Douglas further articulated in the press release that the Company's "[f]ull-year results [for 2022] were driven by significant volume and price gains in every region.  Our continued focus on new product development, commercial launches and market access investments delivered record results in 2022."

54.     With respect to the Company's guidance for 2023, the press release stated that "Full-year 2023 revenue is forecasted to be in the range of $6.08 billion to $6.22 billion, representing an increase of 6 percent at the midpoint versus 2022, driven by strong pricing in all regions and growth in volume driven by new launches and market access.  Full-year adjusted EBITDA range is expected to be $1.48 billion to $1.56 billion, representing 8 percent year-over-year growth at the midpoint."  Commenting on these metrics, the press release quoted Douglas as stating: "We anticipate a positive market backdrop for 2023 that will support our pricing actions as well as continued healthy demand for FMC's synthetic and biological product portfolios. . . . we will continue to closely manage our supply chain in 2023 to take advantage of any cost improvement opportunities while ensuring product availability for our customers."

55.     The next day, on February 8, 2023, FMC held its earnings call for 4Q and FY 22.  During that call, Vertical Research Partners analyst Kevin William McCarthy asked Douglas a question like he had asked the prior quarter; "how would you characterize channel inventory levels in the U.S., Brazil and Argentina…?"

56.     In response, Douglas continued to downplay the buildup in FMC's inventory channels.  According to Douglas, "from a North American perspective, U.S. in particular, I think channel inventories are a little bit elevated right now, but that's normal. . . . When I think of inventory levels for FMC compared to our sales on a percent basis, we're about the same place we were the year before.  So I think it's pretty normal."  And while Brazil and Argentina may have "elevated channel inventories," according to Douglas, that was supposedly because the weather was "very dry in the fourth quarter."

57.     On February 21, 2023, FMC presented at the Citi Global Industrial Tech and Mobility Conference.  At that conference, Citigroup analyst Prashant N. Juvekar asked Sandifer

"about patent expirations on diamides" and "how do you see the cadence of these expirations and what can you do to extend a life?"

58.     In response, Sandifer touted the Company's patent protections on its key products as well as patent infringement cases it purportedly won in India and China while omitting the significant patent losses and generic competition that had already occurred.  According to Sandifer:

> …to give you the big picture, the diamides, Rynaxypyr and Cyazypyr, we have 30 patent families include about 1,000 patents, both granted and applied for that cover broad array of issues that protect the diamides.  The one that gets the most initial focus is the composition of matter patent, is literally the patent on the molecule itself.  Some of those patents have already started to expire for Rynaxypyr.  In fact, in several countries, China, India and certain Eastern European countries, the patent for Rynaxypyr expired in 2022.
>
> Now, that's just one of a small part of the total layer of protections we have around these molecules.  We also have patents on the manufacturing process to make Rynaxypyr and Cyazypyr.  We have patents on the intermediates, the composition amount of patterns on the intermediate materials that are used in that process.  So for example, for Rynaxypyr, it's a 16-stage synthesis process.
>
> Many of the intermediate steps and the chemicals that are produced there really have no other use than for making Rynaxypyr. We have patents on their composition of matter.  We have patents on the process to make several of those as well.   We also have patents on formulations on how that product is finally formulated to take to market. So we've had this broad set of patent protections.  We are also provided some protection to the use of our regulatory data and the way registrations are managed in different countries.   They give us protection that continues well until the end of this decade and, in some cases, a bit longer.
>
> And certainly, with—speaking directly to Rynaxypyr, which has earlier expiration dates, Cyazypyr goes a little bit further. . . . it's not just relying on the patents themselves.  And obviously, we've been very aggressive in enforcing the patents. We have won cases for infringement in both China and India and continue to aggressively defend our patents.  But we've also engage partners and brought other people in the business ahead of any kind of patent expiration.  We don't believe that in our industry, in crop protection, that there really is a patent cliff.  It's more of a long plateau as you transition from being a fully-patented to a post-patented life.

59.     On February 24, 2023, the Company filed its Annual Report for 2022 on Form 10-K with the SEC, which Douglas and Sandifer signed.  The Form 10-K similarly described the

3974903.3

Company's patent protections on its key products, how certain protections "stretch until the end of this decade," and how FMC had achieved "multiple favorable judgments and settlements, including in India and China," without disclosing the true scope of the risk to the Company's patent portfolio that existed at the time. More specifically, the Form 10-K discussed that:

> FMC's process patents cover the manufacturing processes for both active ingredients—chlorantraniliprole and cyantraniliprole—as well as key intermediates that are used to make the final products. Chlorantraniliprole is a complex molecule to produce, requiring 16 separate steps; FMC owns granted patents covering many of these 16 process steps and several of the intermediate chemicals, and we protect other aspects of the manufacturing processes by trade secret. Cyantraniliprole is similarly complex and covered by a comparable range of intellectual property. Many of these intermediate process patents run well past the expiration of the composition of matter patents, and in some cases stretch until the end of this decade. Third parties that intend to manufacture and sell generic chlorantraniliprole or cyantraniliprole and rely on FMC's extensive product safety data will be required to demonstrate that their product has an equivalent regulatory safety profile as FMC's Rynaxypyr® and Cyazypyr® actives. To meet regulatory requirements for such difficult-to-manufacture molecules, we believe that third parties will have to produce these active ingredients using the same processes that are patented by FMC and if so, would be infringing before patent expiration and subject to our challenge for infringement.

> *   *   *

> We actively monitor and manage our patents and trademarks to maintain our rights in these assets and we strategically take aggressive action when we believe our intellectual property rights are being infringed. During 2022, we initiated proceedings to enforce several of our patents and trademarks against generic producers and infringers, resulting in multiple favorable judgments and settlements, including in India and China. In early 2022, we received notice that certain third parties are seeking to invalidate our Chinese patents on a certain intermediate involved in producing chlorantraniliprole and a process to produce chlorantraniliprole; we intend to defend vigorously the validity of both patents. During the third quarter of 2022, the China Patent Review Board issued rulings which held that the two challenged patents were not valid in China. We believe the Review Board's decisions are seriously flawed both on procedural and substantive ground and we have filed appeals.

60.     On March 1, 2023, FMC presented at the Bank of America Global Agriculture and Materials Conference. At that conference, Bank of America analyst Stephen V. Byrne asked

Douglas "And then recall you have a couple of legal battles in India for some generic product. What's the status of those patent infringement cases?"

61.     In response, Douglas painted a misleading picture of the Company's patent litigation landscape, stating that "[t]here's a couple of cases in India that we recently won, a couple of cases in China as well," without disclosing the significant losses that FMC had experienced. Douglas also minimized the amount of generic competition that the Company was experiencing at the time, stating that "when we bought the assets in 2018, there was already illegal material being sold in China, way back in 2018.  That continues today.  It's unfortunately a facet of the Chinese industry that many companies will not respect patents, and they go and make [il]legal materials. So it's not as if we're not used to competing with products out there that are of inferior quality but they are illegal, and we will enforce our patents all over the world."

62.     Also during the March 1, 2023 conference, Bank of America analyst Stephen V. Byrne asked Douglas "to drill in the diamides a little bit.  Where are we at in the patent expiry outlook over the next couple of years and your preparedness for that given your existing contracts with some of the really big crop chemical peers?"

63.     Douglas assured investors that FMC would not face legitimate generic competition until "some point towards the end of this decade," "that the only legal material that's available is from FMC, even though the original patent has come off [] [b]ecause of the strength of the rest of the patent portfolio."

64.     On May 1, 2023, the Company issued a press release announcing earnings for 1Q 23.  In the press release, FMC also set out its outlook for 2Q 23, stating that revenue is to be in the range of $1.42 billion - $1.48 billion and Adjusted EBITDA is to be in the range of $350 million - $370 million.  With respect to the full year of 2023, FMC raised its adjusted EBITDA range by

$10 million at the midpoint to $1.50 billion - $1.56 billion and reiterated its revenue range of $6.08 billion - $6.22 billion.  The press release quoted Douglas as stating that "[w]e are raising our full-year EBITDA guidance, and narrowing our range, based on the first quarter performance and our expectation of continued pricing gains, positive mix supported by new products as well as input cost tailwinds that are projected to be realized in the second half of the year, particularly in the third quarter.  The strength of our portfolio, diversity of crop mix and investments in market access have positioned us well to deliver another year of revenue and earnings growth as well as margin expansion."

65.     The next day, on May 2, 2023, FMC held its earnings call for 1Q 23.  On that call, Joshua David Spector of UBS asked Douglas, "what gives you confidence that inventory levels aren't at risk to the back half or into next year?  And kind of similarly on the diamides [insecticides], where you talk about some partner channel destocking.  What's the visibility that, that doesn't bleed into the second half as well?"

66.     Douglas's response again served to minimize the inventory buildup.  According to Douglas, while there "will be some channel inventory hangover as we go into the next season," "[t]hat occasionally happens" and "what we're telling you in our guidance now is that the partners that are reducing inventories, that's not just an event now that continues through the rest of the year.  So that's already built into our forward-looking guidance."

67.     FMC presented at the Goldman Sachs Industrials and Materials Conference one week later on May 9, 2023.  At that conference, Goldman Sachs analyst Adam Samuelson asked Sandifer "on that demand side . . . just the channel inventory is always a common kind of topic of discussion for you . . . where do you see channel inventories today both coming out of the season

in South America and going into the season in the Northern Hemisphere and the key kind of things you're watching to assess the demand later in the year?"

68.    In response, Sandifer assured investors that "generally, we're pretty comfortable with channel inventory overall around the world" and "we see [] demand for crop protection products being very, very healthy." Sandifer likewise downplayed the saturation of the Company's inventory channels, stating only that there "might be a little bit of channel inventory [in] different spots" because of a "monsoon" or a "drought."

69.    With respect to the Company's patent protection, Goldman Sachs analyst Adam Samuelson also asked Sandifer at the May 9, 2023 conference, "[h]ow do we think about that patent estate rolling off and kind of competition and pricing kind of factoring into that medium-term growth and the confidence that you have that your company cannot just grow sales, but EBITDA."

70.    Sandifer dismissed the then-existing presence of generic competitors in the market, stating that "[s]ome of the earliest patents which are around the composition of matter, composition of matter of the fundamental active ingredient molecules started rolling off last year. Despite that, there's not a single legal competitor in Rynaxypyr in the world today that said differently, that isn't buying it from us. Now there are illegal competitors and have been since before we bought the business. So there's been a legal [sic] material, particularly in China and India, always. But there are no current legal entrants in either of those markets where [] the initial composition of matter patents have expired. And that's in part because that's just the beginning of the story around the patent protection."

71.    The above statements identified in ¶¶33-70 were materially false and/or misleading. In truth, demand for the Company's products was artificially boosted by customer double-ordering

after the dissipation of pandemic disruptions, a transitory occurrence that was unlikely to recur. FMC's channel inventory was full of product due to this pull-forward of orders rather than channel inventory being, as Douglas described it, at "normal" levels or due to cyclical business factors such as seasonality.  What's more, starting in or around September 2022, FMC had lost critical patent litigation in India and China which led to increased competition from generic producers, further exacerbating the company's inventory buildup.  FMC knew or recklessly disregarded these facts at the time given the Company's claimed oversight of its patent portfolio and in-depth supervision of its supply chain, where it supposedly had keen visibility into demand, inventory levels, and how customers used the products.

## The Truth Begins to be Revealed

72.     On July 10, 2023, before the market opened, FMC published a press release announcing that it had experienced "[a]brupt and unprecedented reductions in channel inventory by customers in North America, Latin America and EMEA" leading to "unprecedented volume declines" across nearly all its business "as our channel partners rapidly reduced inventory levels." As a result, FMC slashed its 2Q 23 Adjusted EBITDA forecast by about 50% to a range of $185-$190 million (after raising full year EBITDA outlook just two months earlier) and cut its full year Adjusted EBITDA to a range of $1.3-$1.4 billion.  In addition, FMC announced that it imposed "[s]ignificant cost mitigation actions," cutting operating expenses in the second half of the year by $60-$70 million to conserve costs.

73.     Wall Street analysts questioned whether FMC overstated demand in prior years as well as the Company's justification for the destocking.  Morgan Stanley analyst Vincent Andrews wrote on July 10, 2023, that "[k]ey investor questions are likely to include . . . [w]hy is the destocking taking place given the company is calling out flat underlying grower consumption of

FMC's products? [] does this mean that volume sales in prior years[] overstated underlying demand and therefore this is actually an earnings reset."  Echoing Morgan Stanley's concerns, Bank of America Global Research analyst Stephen V. Byrne also questioned the claimed strength and nature of FMC's demand, writing in a July 11, 2023 report that the "[m]ost concerning point, in our view, is volumes last year [] were largely buoyed by customer double-ordering due to the supply chain constraints.  This means 'normalized' CPC volumes could be well-below last year's level."

74.    The news of the abrupt and unprecedented reductions in inventory caused the price of FMC common stock to decline $11.62 per share, or over 11%, from $104.25 per share on July 7, 2023 to $92.63 per share on July 10, 2023.

75.    Nevertheless, Douglas falsely assured investors in FMC's July 10, 2023 press release that "[e]ven as we manage through this market contraction and significant inventory reduction by our channel partners, on-the-ground consumption of our products remains strong and at similar levels to last year."  These materially false and misleading statements caused the price of FMC common stock to continue to trade at artificially inflated prices.

76.    On September 7, 2023, activist investment firm Blue Orca Capital issued a report claiming that FMC "concealed from investors the deterioration of [its] core business[,] resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits."  To support its claims, Blue Orca "spoke to a number of experts, including former employees of FMC and its distribution partner [UPL] who said that a reversal of the factors which temporarily boosted the Brazilian crop protection market during the Covid induced supply chain disruption is likely to drop the crop protection industry back to 2021 levels, erasing the gains of the last 2-3 years."

77.     More specifically, one of the executives to whom Blue Orca spoke is a current senior finance executive at UPL in Brazil.  The UPL executive explained to Blue Orca how the crop protection market in Brazil grew from $12 billion to $21 billion in the last three years.  According to the executive and as recounted by Blue Orca, "this growth was 'very unusual' and resulted because of shortages caused by a perfect storm of COVID, China supply chain disruptions, labor shortages, the Russia/Ukraine war, and supply chains permanently migrating away from China.  He explained that these events caused crop protection product shortages that caused prices to skyrocket and, at the same time, distributors and cooperatives scrambled to over-purchase whatever they could because of fear of prolonged supply shortages."

78.     Blue Orca further described how "FMC has concealed from investors that it has suffered a recent string of stunning legal defeats around the globe that have enabled competitors to now launch competing generics at prices up to 80% below the price of FMC's flagship insecticide product."  Indeed, according to Blue Orca, "[d]espite the expiration of the composition patents on FMC's diamides, FMC tells investors it will not face generic competition on its flagship products until 2026 at the earliest because FMC still holds a suite of 'process' patents, which FMC claims will bar generic entrants for the next several years.  Absurdly, FMC even tells investors that 'there is not a single legal competitor … in the world today.' This is simply not true."  (emphasis removed).  The additional generic competition appears to have further dented demand for the Company's products and exacerbated the inventory surplus caused by customers' double-buying behavior.

79.     According to Blue Orca's investigation, "FMC Recently Lost Critical Patent Litigation in India and China."  The activist "found dozens of legal competitors . . . who are, right now, manufacturing and selling generic versions of FMC's top selling insecticide product in

FMC's most important markets at much lower prices.  In China for example, competitors are selling generics for up to 80% below the price of FMC's branded equivalent.  In FMC's key market of India, the Delhi High Court recently found FMC guilty of misleading the court and the patent office, and well-capitalized competitors have now launched generic versions of [one of] FMC's top selling [] product[s] at cut prices."

80.      Blue Orca also described how starting at least as early as September 2022, "Indian courts have recently unequivocally rejected FMC's process patent defenses and refused to enjoin generic competitors from manufacturing and selling competing generic" products.  Blue Orca identified "hundreds of product registrations" in the country.

81.      Also starting at least as early as September 2022, according to Blue Orca, "[i]n China, the National Intellectual Property Office rejected FMC's process patent claims thereby greenlighting generic competitors" and launching "over 60 competitors."  Now, FMC appears to be on the brink of losing a similar legal defeat in Brazil, its largest market.

82.      In response to this news, the price of FMC common stock declined $6.09 per share, or about 7%, from $82.19 per share on September 6, 2023 to $76.10 per share on September 7, 2023.

83.      Again, FMC continued to make materially false and misleading statements to investors that caused the price of the Company's common stock to trade at artificially inflated prices.  The same day Blue Orca issued its report, on September 7, 2023, FMC published a press release that characterized the report as "misleading and factually inaccurate."

84.      Then, on October 23, 2023, FMC published a press release revealing that the Company cut its revenue and earnings outlook for 3Q and FY 2023 due to continued destocking throughout its entire business, with the reductions being particularly severe in Latin America, and

specifically, Brazil and Argentina.  FMC announced that its: 3Q 23 revenue was expected to be $982 million with Adjusted EBITDA of $175 million; 4Q 23 revenue was expected to be $1.139 billion - $1.379 billion with Adjusted EBITDA of $246 million - $306 million; and FY 2023 revenue was expected to be $4.48 billion - $4.72 billion with Adjusted EBITDA of $970 million - $1.03 billion.

85.    FMC also acknowledged in the October 23, 2023 press release that the "significant global destocking impacts are expected to persist into next year" and are "not expected to improve in the near-term."  As a result, FMC "initiated an immediate restructuring process for our operations in Brazil" and "launched a broader, more comprehensive process to review and adjust our total Company cost structure."  Still, Douglas assured investors that "application of products by growers remains stable," causing the price of FMC common stock to remain artificially inflated.

86.    Despite Douglas's assurance, the news disclosed on October 23, 2023 caused the price of FMC common stock to decline $8.83 per share, roughly 13%, from $66.95 per share on October 20, 2023, to $58.12 per share on October 23, 2023.

87.    Finally, on October 30, 2023, after the market closed, the Company reported earnings results for 3Q 23.  In a press release that FMC published on October 30, the Company revealed that revenue for the quarter declined 29% as compared to the prior year, driven primarily by lower volumes from "channel destocking," with the destocking being particularly "severe" in Brazil (although it continued in all regions).  As a result, the Company recorded a loss of three cents per share in 3Q 23 as compared to a profit of 95 cents in 3Q 22.

88.    Before the market opened on October 31, 2023, the Company held its earnings conference call for 3Q 23.  On that call, Sandifer discussed how the "sudden deceleration" in FMC's earnings required the Company to negotiate temporary debt covenant relief.

89.     The news revealed on October 30 and 31, 2023 caused the price of the Company's common stock to decline $4.76 per share, or over 8%, from $57.96 per share on October 30, 2023 to $53.20 per share on October 31, 2023.

## LOSS CAUSATION

90.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of FMC common stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on July 10, 2023, September 7, 2023, October 23, 2023, and October 30-31, 2023, as alleged herein, the price of FMC common stock fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of FMC common stock during the Class Period, Plaintiff and other members of the purported Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and 23(b)(3) under the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired FMC common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of FMC and their families and affiliates.

92.     The members of the putative Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of September 30, 2023, there were more than 124.7 million shares of FMC common stock outstanding, owned by at least thousands of investors.

93.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the purported Class which predominate over questions which may affect individual putative Class members include:

A.   Whether Defendants violated the Exchange Act;

B.   Whether Defendants misrepresented and/or omitted material facts;

C.   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.   Whether Defendants knew or recklessly disregarded that their statements and/or omissions were materially false and misleading;

E.   Whether the price of FMC's common stock was artificially inflated;

F.   Whether Defendants' conduct caused the members of the proposed Class to sustain damages; and

G.   The extent of damage sustained by putative Class members and the appropriate measure of damages.

94.     Plaintiff's claims are typical of those of the putative Class because Plaintiff and the putative Class sustained damages from Defendants' wrongful conduct.

95.     Plaintiff will adequately protect the interests of the proposed Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the putative Class.

96.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

97.     FMC's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.  The statements alleged to be false and misleading above relate to then-existing facts and conditions.

98.     To the extent there were any forward-looking statements, they were not sufficiently identified as such at the time they were made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

99.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of FMC who knew that the statement was false.

## PRESUMPTION OF RELIANCE

100.     At all relevant times, the market for FMC's common stock was an efficient market for the following reasons, among others:

A.   FMC common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

B.   As a regulated issuer, FMC filed periodic public reports with the SEC;

C.   FMC regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-

ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.   FMC was followed by many securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

101.   As a result of the foregoing, the market for FMC common stock promptly digested current information regarding FMC from all publicly available sources and reflected such information in the price.  Under these circumstances, all purchasers of FMC's common stock during the Class Period suffered similar injury through their purchase of FMC's common stock at artificially inflated prices and the presumption of reliance applies.

102.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the putative Class's claims are grounded on Defendants' material omissions during the Class Period and caused harm to Plaintiff and the proposed Class.  Because the complaint alleges Defendants' failure to disclose material adverse information regarding FMC—information Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material omissions set forth above, including with respect to the demand for FMC's products, level of channel inventories and loss of crucial patent protections, that requirement is satisfied here and *Affiliated Ute* provides a separate basis for adopting a presumption of reliance.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

103.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

104.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other proposed Class members, as alleged herein; and (ii) cause Plaintiff and other members of the putative Class to purchase FMC common stock at artificially inflated prices.

105.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for FMC common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

106.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the demand for FMC's products, level of channel inventories and loss of patent protections, as well as the Company's business, operations, and prospects, as specified herein.

107.    During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose of concealing FMC's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock.

109.    Plaintiff and the putative Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FMC common stock.  Plaintiff and the proposed Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

110.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the proposed Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

111.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against The Individual Defendants**

112.    Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

113.    The Individual Defendants acted as controlling persons of FMC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions,

participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about FMC, the Individual Defendants had the power and ability to control the actions of FMC and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

114.    Plaintiff demands a jury trial.

3974903.3

Dated: December 7, 2023

Respectfully submitted,

**HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER**

*/s/ John S. Summers*
John S. Summers
Michael J. Masciandaro
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 568-6200
Facsimile:  (215) 568-0300
jsummers@hangley.com
mmasciandaro@hangley.com

*Local Counsel for Plaintiff*

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar (*pro hac vice* forthcoming)
7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com

-and-

Nancy A. Kulesa (*pro hac vice* forthcoming)
75 Virginia Road
White Plains, New York 10603
Telephone: (914) 265-2991
Facsimile: (212) 205-3960
nkulesa@bfalaw.com

*Counsel for Plaintiff*

## CERTIFICATION

I, Chase Rankin, on behalf of Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters"), as Executive Director of Oklahoma Firefighters, hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of Oklahoma Firefighters.

2.     I have reviewed the Complaint against FMC Corporation ("FMC") and others alleging violations of the federal securities laws and have authorized its filing.

3.     Oklahoma Firefighters did not purchase or sell securities of FMC that are the subject of the Complaint at the direction of counsel, or in order to participate in any private action under the federal securities laws.

4.     Oklahoma Firefighters is willing to serve as a representative party in this matter, including providing testimony at deposition and trial, if necessary.

5.     Oklahoma Firefighters' transactions in the FMC securities that are the subject of the Complaint during the class period specified therein of February 9, 2022 to October 30, 2023, inclusive, are reflected in Schedule A, attached hereto.

6.     For securities retained, Oklahoma Firefighters owns and holds legal title to the securities that are the subject of this litigation.  For securities sold, Oklahoma Firefighters owned and held legal title to the securities that are the subject of this litigation at all relevant times.

7.     Oklahoma Firefighters has sought to serve as a lead plaintiff and representative party in a class action filed under the federal securities laws during the last three years, and was appointed, in the following:

- *Black v. Snap, Inc.*, No. 2:21-cv-08892 (C.D. Cal.);
- *Lee v. Goldman Sachs Group Inc.*, No. 1:22-cv-00169 (S.D.N.Y.);
- *Oklahoma Firefighters Pension and Retirement System v. Biogen Inc.*, No. 1:22-cv-10200 (D. Mass.);
- *Rasella v. Musk*, No. 1:22-cv-03026 (S.D.N.Y.);
- *Das v. Unity Software Inc.*, No. 5:22-cv-03962 (N.D. Cal.); and
- *City of Hollywood Firefighters Pension Fund v. Atlassian Corp.*, No. 3:23-cv-00519 (N.D. Cal.).

8.      Oklahoma Firefighters has also sought to serve as a lead plaintiff and/or representative party in a class action filed under the federal securities laws during the last three years, but was not appointed, in the following:

- *In re Peabody Energy Corp. Securities Litigation*, No. 1:20-cv-08024 (S.D.N.Y.);
- *Ryan v. FIGS, Inc.*, No. 2:22-cv-07939 (C.D. Cal.); and
- *Vazquez v. Masimo Corp.*, No. 3:23-cv-01546 (S.D. Cal.).

9.      Oklahoma Firefighters serves as a representative party, but not as lead plaintiff, in a class action filed under the federal securities laws during the last three years, in the following:

- *Lozada v. TaskUs, Inc.*, No. 1:22-cv-01479 (S.D.N.Y.).

10.      Beyond its *pro rata* share of any recovery, Oklahoma Firefighters will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of December, 2023.


_____
Chase Rankin
Executive Director
*Oklahoma Firefighters Pension and Retirement System*

**SCHEDULE A**
TRANSACTIONS IN
FMC CORP

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 04/05/2022 | 2,960.00 | 134.20 | ($397,246.21) |
| Purchase | 09/23/2022 | 1,141.00 | 104.09 | ($118,771.94) |
| Purchase | 09/23/2022 | 698.00 | 103.83 | ($72,469.85) |
| Purchase | 09/26/2022 | 1,156.00 | 103.74 | ($119,921.13) |
| Purchase | 09/26/2022 | 2,312.00 | 104.22 | ($240,946.70) |
| Purchase | 09/26/2022 | 578.00 | 104.03 | ($60,128.07) |
| Purchase | 09/27/2022 | 620.00 | 105.06 | ($65,137.45) |
| Purchase | 09/27/2022 | 890.00 | 104.83 | ($93,298.26) |
| Purchase | 09/28/2022 | 1,844.00 | 108.65 | ($200,341.93) |
| Purchase | 09/28/2022 | 302.00 | 108.58 | ($32,789.92) |
| Purchase | 09/29/2022 | 1,099.00 | 106.03 | ($116,524.55) |
| Purchase | 09/29/2022 | 327.00 | 105.93 | ($34,639.73) |
| Purchase | 09/30/2022 | 1,753.00 | 106.02 | ($185,861.30) |
| Purchase | 09/30/2022 | 232.00 | 105.98 | ($24,587.36) |
| Purchase | 09/30/2022 | 752.00 | 105.85 | ($79,600.18) |
| Purchase | 09/30/2022 | 347.00 | 105.95 | ($36,762.92) |
| Purchase | 10/17/2022 | 1,376.00 | 114.43 | ($157,455.27) |
| Purchase | 10/18/2022 | 1,730.00 | 117.08 | ($202,556.36) |
| Purchase | 11/02/2022 | 2,877.00 | 120.96 | ($347,993.58) |
| Purchase | 12/19/2022 | 1,526.00 | 122.77 | ($187,350.68) |
| Purchase | 12/20/2022 | 1,397.00 | 123.78 | ($172,919.40) |
| Purchase | 02/02/2023 | 4,409.00 | 128.38 | ($566,021.25) |
| Purchase | 02/03/2023 | 2,017.00 | 128.58 | ($259,353.52) |
| Purchase | 02/06/2023 | 2,863.00 | 125.62 | ($359,641.76) |
| Purchase | 02/07/2023 | 739.00 | 126.05 | ($93,151.25) |
| Purchase | 02/09/2023 | 1,913.00 | 129.13 | ($247,022.25) |
| Purchase | 02/10/2023 | 971.00 | 131.09 | ($127,290.43) |
| Purchase | 02/15/2023 | 1,218.00 | 128.75 | ($156,811.65) |
| Purchase | 02/16/2023 | 705.00 | 129.57 | ($91,347.84) |
| Sale | 04/25/2023 | -1,429.00 | 122.03 | $174,380.87 |
| Purchase | 04/27/2023 | 1,078.00 | 121.57 | ($131,049.77) |
| Purchase | 07/06/2023 | 3,602.00 | 103.30 | ($372,101.01) |